**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **SHANGIA WASHINGTON,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| **Warden CEDRIC TAYLOR, Unit Manager KENNETH FARLEY, Unit Manager LILIAN WARREN, Correctional Officer KRYSTLE MILNER,** | **5:19-cv-00178-TES** |
| *Defendants.*[1] | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Shangia Washington filed a lawsuit under 42 U.S.C. § 1983 alleging that Defendants Cedric Taylor, Kenneth Farley, Lilian Warren, and Krystle Milner were deliberately indifferent to his safety when they failed to protect him from being stabbed in an altercation with two fellow inmates in violation of his rights secured by "the Eighth Amendment of the Constitution and laws of the United States and the Constitution and laws of the State of Georgia." [Doc. 1 at ¶¶ 16–19, 21]. With the benefit of discovery, Defendants filed a Motion for Summary Judgment [Doc. 14], and after a review of the record and applicable law, the Motion is due to be **GRANTED**.

---

[1] Washington only sued Defendants in their individual capacities. [Doc. 1 at ¶ 22].

## FACTUAL BACKGROUND

Washington has been incarcerated with the Georgia Department of Corrections

("GDC") since 2006. [Doc. 14-2 at ¶ 6]. From January 2017 until January 2018,

Washington was housed at Baldwin State Prison ("BSP")[2] and assigned to a cell in

Building H due to his mental health issues. [*Id.* at ¶¶ 7–8].[3]

As a mental health dorm, Building H has a Priority 1 staffing profile, which

requires the presence of two officers at all times: one officer stationed in the control

booth observing its four dorms and the other patrolling those dorms. [*Id.* at ¶ 12]; [Doc.

14-7, Taylor Decl., ¶ 13]. Building H has a common hallway that connects these four

distinct dorms—Dorms H-1, H-2, H-3, and H-4. [Doc. 14-2 at ¶ 13]. The observation

booth is centrally located in the hallway where an officer can see into each dorm. [*Id.*].

Washington was housed in H-3: a split-level design with stairs connecting the day

room[4] of the dorm to a lower level and upper level where inmates' cells are located. [*Id.*

---

[2] At all times relevant to this lawsuit, Defendant Taylor served as the warden of BSP, responsible for the overall operation of the facility; Defendant Farley was the unit manager for Building K at BSP; Defendant Warren was the unit manager for Building H; and Defendant Milner worked in Building H as a correctional officer tasked primarily with patrolling that building and checking on inmates to make sure they were safe and secure. [Doc. 14-2 at ¶¶ 1–4].

[3] As a mental health dorm, Building H is a supportive living unit where inmates are seen daily by counselors, mental health staff, and other members of the Care and Treatment Unit. [Doc. 14-2 at ¶ 9]; [Doc. 14-7, Taylor Decl., ¶ 7]. Defendant Taylor (the warden) also conducts daily rounds in Building H. [Doc. 14-2 at ¶ 10].

[4] The "day room" is simply a common area where the inmates socialized. [Doc. 14-2 at ¶ 15]. It has three televisions, an ice chest, telephones, and computer kiosk. [*Id.* at ¶ 19].

at ¶¶ 14–16]. Washington and another inmate shared a cell on the upper level of H-3, and Inmates Raymond Dugger, Jr.[5] and Dejuan Gladdney[6] shared a cell on H-3's lower level. [*Id.* at ¶¶ 17–18].

During the evening of December 22, 2017, Washington was watching television in the day room. [*Id.* at ¶ 20]. After his program ended, he gave the television remote to Inmate Dugger who began watching a cartoon with Inmate Gladdney and then Washington "went to [his] room." [*Id.* at ¶¶ 20–21]; [Doc. 14-3, Washington Depo., p. 17:6–7]. Shortly thereafter, Washington returned to the day room—this time, "to watch the sports television." [Doc. 14-3, Washington Depo., p. 17:10–11]. While Washington watched a basketball game, Inmate Dugger began taunting him. [*Id.* at pp. 17:13— 18:22]; [Doc. 14-3, Washington Depo., p. 31:8]. An argument escalated, and Washington "ran to [his] room," put on his boots, and returned to the day room with a broken broomstick in hand.[7] [Doc. 14-2 at ¶ 23]; [Doc. 14-3, Washington Depo., pp. 18:19—19:9].

---

[5] Defendants state that prior to the incident leading to this case, "[Washington] did not have any conflict with Inmate Dugger. [Doc. 14-2 at ¶ 55]. Washington, however, denies that this statement is true. [Doc. 19-1 at ¶ 55]. He states that Inmate Dugger had "been jugging at [him] for over a month" and "throwing threats out." [Doc. 14-3, Washington Depo., pp. 24:25—25:2, 33:3–4]. "Jugging," as Washington defines the term, means "taunting." [*Id.* p. 18:3–4].

[6] Washington admits that he did not have any conflict with Inmate Gladdney prior to the incident leading to this case. [Doc. 19-1 at ¶ 56].

[7] Given that Inmate Dugger kept "jugging" at him, Washington "ask[ed] multiple different people" to move him out of the H-3 dorm. [Doc. 19-1 at ¶ 60]. However, he never filed a request with the Classification Committee for a housing reassignment or a request for protective custody while he was housed with Inmates Dugger and Gladdney in H-3. [*Id.*]; *see also* [Doc. 14-2 at ¶¶ 59–60]; [Doc. 14-3, Washington Depo., pp. 24:25—25:11]. Only mental health professionals could authorize an inmate's assignment to Building H or authorize his removal to another building. [Doc. 14-2 at ¶ 11].

At the beginning of a BSP surveillance video, Washington can be seen coming down the stairs from his cell with the broomstick while arguing with Inmate Gladdney. [Doc. 14-2 at ¶¶ 26–27]. A few moments later, Washington goes back up the stairs, stands at the top, and continues to argue with Inmate Gladdney, but later comes back down to the day room and "half-swings the broomstick" towards Inmate Gladdney but doesn't hit him. [*Id.* at ¶¶ 28–29]. For "about two minutes" they continued to argue, with Washington traversing the stairs "prominently displaying his broomstick." [*Id.* at ¶ 30].

At this point, Inmates Dugger and Gladdney left the day room and went to the lower level towards their cell; but, less than a minute later, Inmate Gladdney returned to the day room and he and Washington resumed arguing. [*Id.* at ¶¶ 31–32]. Broomstick in hand, Washington walked back down the stairs and approached Inmate Gladdney, but then he began arguing with Inmate Dugger who was standing by the stairs connecting the day room with the lower level of H-3. [*Id.* at ¶¶ 33–34]. Inmate Gladdney turned his back to Washington, and Washington "rushe[d] at Inmate Gladdney," hit him with the broomstick, and, not surprisingly, a full-on fight ensued. [*Id.* at ¶ 35]. Seconds later, Inmate Dugger joined in. [*Id.* at ¶ 36].

During the fight, Washington jumped off of a nearby table, picked up his broomstick, and "once again" used it to attack Inmate Gladdney. [*Id.* at ¶¶ 37–38]. Washington momentarily got the upper hand when he got "on top of Inmate

4

Gladdney" and was punching him. [*Id.* at ¶ 39]. However, Inmate Dugger had brought a shank to a fist fight. [*Id.* at ¶ 58]; [Doc. 14-10 at p. 32]. In a little over 20 seconds, Inmate Dugger stabbed Washington 38 times, and the three only stopped fighting when another BSP official deployed his pepper spray. [Doc. 14-2 at ¶ 40]; [Doc. 14-3, Washington Depo., pp. 21:22–23; 67:2–3]. Once the inmates stopped fighting, Washington ran out of the dorm and into the common hallway. [Doc. 14-2 at ¶¶ 13, 40].

Before the 62-second fight began, Defendant Milner's patrol of the dorms found her standing in the hallway just outside the door of H-3, and her partner, Officer Johnson (who is not a named defendant in this lawsuit), manned his post in the observation booth.[8] [*Id.* at ¶¶ 13, 41–43]. When the inmates began to argue, Defendant Milner radioed for backup, but, according to Washington, an unnamed officer told her, "Don't call [for backup] until they start fighting." [*Id.* at ¶ 45]; [Doc. 14-3, Washington Depo., p. 26:16–24].

The parties dispute whether Defendant Milner ordered Washington and Inmate Gladdney to stop arguing, whether she ordered Washington to put the broomstick down, and whether Washington ignored her verbal orders. *Compare* [Doc. 14-2 at ¶¶

---

[8] Based on this, Defendants contend that "[t]wo officers were present at all times during the altercation." [Doc. 14-2 at ¶ 44]. In his Response to Defendants' Statement of Material Facts, Washington neither admits or denies this statement. *See* [*id.*] *in connection with* [Doc. 19-1 at ¶ 44]. Thus, in accordance with the Court's Local Rules, this statement is deemed admitted. LR 56, MDGa ("All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted . . . .").

46–48] *with* [Doc. 19-1 at ¶¶ 46–48].[9] On deposition, Washington testified, "[Defendant Milner] wrote a disciplinary report[10] against me saying that she instructed me to put the broomstick down that I broke to use to defend myself. But I refused to put the broomstick down[.]" [Doc. 14-3, Washington Depo., 25:13–18]. Washington's position is that Defendant Milner never "verbally ordered anything." [Doc. 19-1 at ¶ 48]. However, in her declaration, Defendant Milner states that she "verbally ordered [Inmates Washington and Gladdney] to stop [arguing], but they did not" and that she "verbally instructed Inmate Washington to put the stick away and go back to his cell, but he ignored [her] instructions." [Doc. 14-5, Milner Decl., ¶¶ 6–7, 15].

Regardless of whether Defendant Milner issued any verbal order or instruction to the inmates directly, she repeated her request for backup, this time reporting that inmates in H-3 were fighting.[11] [Doc. 14-2 at ¶ 49]. Within one minute, backup arrived

---

[9] Here, Defendants make two statements. First, they contend that "[Washington] ignored Defendant Milner's orders." [Doc. 14-2 at ¶ 47]. Second, they claim that "[a]fter [Washington] and Inmates Dugger and Gladdney began fighting, Defendant Milner verbally ordered them to stop." [*Id.* at ¶ 48]. Washington denies both of these statements. He "refutes [that] Defendant Milner order[ed] him to put down the broomstick[,]" and that "Defendant Milner verbally ordered anything." [Doc. 19-1 at ¶¶ 47–48]. Technically, Defendants' two statements can, under Local Rule 56, be deemed admitted because Washington, in denying their statements, failed to controvert them by "specific citation to particular parts of materials in the record." LR 56, MDGa. However, as discussed throughout the remainder of this Order, the factual issue of whether Defendant Milner gave any verbal order is not material to the Court's ruling.

[10] Washington was provided a disciplinary report hearing, and he was "found guilty of those charges and was sanctioned." [Doc. 14-2 at ¶ 53].

[11] As the only officer present at the actual scene of the fight within Building H, Defendant Milner, in following GDC protocol and training, knew that she needed to wait for backup to arrive before she opened the door to H-3 or enter the cell where the three inmates were fighting. [Doc. 14-2 at ¶ 52]; [Doc. 14-5, Milner Decl., ¶ 23 ("[Backup] is necessary because the fight may be a ruse to get the door open, thereby endangering [Defendant Milner], [her] colleague, and other inmates.")].

and "they too ordered [Washington] and Inmates Dugger and Gladdney to stop."[12] [*Id.* at ¶ 50]. When the inmates continued to ignore these orders, an officer doused them with pepper spray, and the fighting stopped.[13] [*Id.* at ¶ 51].

## DISCUSSION

### A.   Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a

---

[12] Here, Washington admits that "*they too* ordered [him] and Inmates Dugger and Gladdney to stop." [Doc. 19-1 at ¶ 50] (emphasis added). If this fact is true, and Washington admitted that it is, logic dictates that the implication of "too" means that someone else, Defendant Milner ostensibly, had already ordered Washington and Inmates Dugger and Gladdney to stop fighting before backup gave its own set of orders. *See* n.9, *supra*.

[13] Defendants Farley, Taylor, and Warren were not present and did not observe any part of this incident. [Doc. 14-2 at ¶ 54].

genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[14] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails

---

[14] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

to address another party's assertion of fact as required by Federal Rule of Civil

Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion.

Fed. R. Civ. P. 56(e)(2); *see also* nn.8–9, *supra*. However, "credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are

jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for
> trial. Rather, on summary judgment, the district court must accept as fact
> all allegations the [nonmoving] party makes, provided they are sufficiently
> supported by evidence of record. So[,] when competing narratives emerge
> on key events, courts are not at liberty to pick which side they think is more
> credible. Indeed, if "the only issue is one of credibility," the issue is factual,
> and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and

all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable

jury could make more than one inference from the facts, and one of those permissible

inferences creates a genuine issue of material fact, a court cannot grant summary

judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at

1263.

**B.**   **Defendants' Motion for Summary Judgment**

In support of their Motion, Defendants contend that they are entitled to qualified immunity because Washington cannot show an Eighth Amendment violation against Defendants Taylor, Farley, Warren, and Milner and because he cannot show a supervisory liability claim against Defendant Taylor under the Eighth Amendment. *See generally* [Doc. 14-1].

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (citation omitted); [*Id.* at pp. 17–20]. Since neither party disputes that Defendants were acting within the scope of their discretionary authority as correctional officers working at BSP at all times relevant to this case, the burden shifts to Washington to show that Defendants violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id.*; *see also* [Doc. 19 at pp. 11–12]; [Doc. 20 at pp. 7–9 (citing [Doc. 1 at ¶¶ 1–4])].

1.   Eighth Amendment Claim

Violent assaults in prison are not "part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). And in this case, no one disputes that prison officials have a duty to protect

prisoners from violence at the hands of other prisoners and that a prison official's deliberate indifference to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828, 833 (citation omitted). That said, "it is not . . . every injury suffered by one prisoner at the hands of another that translates into *constitutional* liability for prison officials responsible for the victim's safety." *Id.* at 834 (emphasis added).

To establish a § 1983 claim for deliberate indifference, the prisoner must first "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citation omitted). Second, "a prison official must have a 'sufficiently culpable state of mind' . . . one of 'deliberate indifference' to [the prisoner's] health or safety[.]" *Id.* (citations omitted). Even if an Eighth Amendment violation is shown, the prisoner must also be able to demonstrate "causation" between that violation and the prison official's conduct. *Marbury*, 936 F.3d at 1233. In short, "[t]o survive summary judgment on a deliberate indifference failure-to-protect claim, '[Washington] must produce sufficient evidence of (1) a substantial risk of serious harm; (2) . . . [D]efendant[s'] deliberate indifference to that risk; and (3) causation.'" *Mosley v. Zachary*, --- F.3d ----, 2020 WL 4249433, at *3 (11th Cir. July 24, 2020).

a.    *Substantial Risk of Serious Harm*

Turning first to whether Washington faced a substantial risk of serious harm, this element "is assessed objectively and requires [him] to show 'conditions that were

extreme and posed an unreasonable risk of serious injury to his future health or safety.'" *Marbury*, 936 F.3d at 1233 (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)). "[A]n excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm." *Lane*, 835 F.3d at 1307.  However, "occasional, isolated attacks by one prisoner on another may not constitute" an Eighth Amendment violation. *Id.* Instead, it is "confinement in a prison where violence and terror reign [that] is actionable." *Id.*

There are two ways by which Washington can show an objectively substantial risk of serious harm: (1) by presenting an individual risk that is personal to him or (2) by showing an environmental risk based on generally dangerous prison conditions. *See Bugge v. Roberts*, 430 F. App'x 753, 758 (11th Cir. 2011); *Marbury*, 936 F.3d at 1234 ("To establish deliberate indifference based on a generalized risk, the plaintiff must show 'that serious inmate-on-inmate violence was the norm or something close to it.'"). Here, Washington must proceed on the individualized-risk track because he failed to submit any evidence into the record showing that BSP is a generally dangerous prison.[15]

In briefing, however, Washington doesn't really give examples of how he can show this objectively substantial risk. *See, e.g.*, [Doc. 19 at pp. 7–8]. Instead, Washington

---

[15] When it comes to a generalized risk, Washington never disputes Defendants' contention that he couldn't show that BSP is a prison "where violence and terror reign." [Doc. 14-1 at p. 7 (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014))]; [Doc. 19 at pp. 7–9]. Even if Washington attempted to take this route and argue that BSP is a generally dangerous institution, he would not be successful because "he has made no allegations regarding the specific features of the prison that would make it particularly violent." *Marbury*, 936 F.3d at 1235.

appears to assume that he has sufficiently shown the requisite risk and largely focuses his attention towards arguments that Defendants knew about it. [*Id.*]. Such arguments are related to the second element of the deliberate-indifference analysis, not the first. *Mosley*, 2020 WL 4249433, at *3. Notwithstanding this rather important omission, Washington's deposition does most of the heavy lifting for him.

On the issue of whether he faced an objectively substantial risk of serious harm, Washington testified that Inmates Dugger and Gladdney were "jugging" at him "and throwing threats out" "for over a month." [Doc. 14-3, Washington Depo., p. 25:1–2]. Now, these threats, as Washington candidly admits, weren't always directed at him. *See, e.g.*, [*id.* at p. 50:20–21 (Washington's deposition testimony showing that Inmates Dugger and Gladdney were "taunting everybody in the dorm")]. For example, Washington recounted one instance during his deposition where Inmates Dugger and Gladdney—a week before he was stabbed—"was threatening this white dude and they was flashing him knives." [*Id.* at p. 49:9–11]. From Washington's point of view, "[t]hese folks been in prison, they establish a reputation for what they do with this violence. So[,] it's known that he [*sic*] will stab someone." [*Id.* at p. 51:18–20].

When asked about Inmate Dugger's actions specifically, Washington stated that Inmate Dugger "brags about violence, about stabbing people, how he was previously at this camp and they transferred him for stabbing [and] robbing people. This is what he brags about, like it's a badge of honor. 'I just got off lockdown for stabbing somebody.'"

13

[*Id.* at pp. 32:3; 33:9–14]. When describing Inmate Dugger's actions, Washington says that Inmate Dugger "will get up and . . . will just be talking loud early in the morning about people he stabbed, situations he done been in, about his war stories" and say things like "'I don't mind about stabbing. That's what I like to do because that's what I do, and I'm going to end up stabbing one of you mother fuckers [*sic*].'" [*Id.* at 54:5–8]. Not only has Inmate Dugger "engag[ed] in conversation with [other] people" telling them, "I will wet your ass up," he has also made the same comment to Washington. [*Id.* at p. 54:15–21].

As for Inmate Gladdney, Washington testified that although he was "not as verbal," "he had the same mentality as [Inmate] Dugger," and would let people "know that he's . . . 'with it' . . . on the violence." [*Id.* at p. 56:15–20]. Inmate Gladdney's alleged affiliation with a gang also made Washington want to move because "the only thing you hear from" his "particular organization . . . is violence and death." [*Id.* at pp. 57:14—58:3]. At bottom, "from the things [Washington] observed" as to "[t]heir actions," he saw Inmate Dugger and Gladdney's "presence in the dorm" as a "danger to [his] life." [*Id.* at pp. 53:8; 60:20–21; 61:10–14].

In the Eleventh Circuit, "[t]here must be a 'strong likelihood' of injury, 'rather than a mere possibility'" before liability under the Eighth Amendment will attach. *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015). Thus, Washington's deliberate-

indifference claim fails because he has not demonstrated a genuine issue of material fact as to whether he faced a strong likelihood of a substantial risk of injury. Here's why.

The only thing revealed by the evidence is how Washington perceived Inmates Dugger and Gladdney during the "six weeks or so" they were housed together in H-3. [Doc. 14-3, Washington Depo., pp. 48:4–7; 53:21–23]. Within that timeframe, there is no evidence that Washington saw either Inmate Dugger or Inmate Gladdney stab anyone prior to their altercation on December 22, 2017. [*Id.* at pp. 57:3—61:13]. Even more telling is that Washington never offered any evidence that he heard from other inmates about an occasion where Inmate Dugger or Inmate Gladdney stabbed or violently assaulted another inmate within this approximate six-week period. [*Id.* at p. 66:5–11; *see also* [Doc. 14-3 at p. 52:21–24 (showing that aside from what Washington personally witnessed about Inmates Dugger and Gladdney, he learned some things about their "reputation" through "inmates talk[ing]")]. Even based on his perceptions and "inmate[] talk," Washington testified that he "didn't have in [his] mind or fathom that this man's fixing to pull a knife out on [him] or [that] he's fixing to come at [him] the way he's fixing to come at [him]." [Doc. 14-3, Washington Depo., pp. 52:23¬24; 118:26—119:3].

Based on this evidence, Washington's assertion of a risk personal to him demonstrates only a mere possibility of an assault and that is not enough—he needed to plausibly allege a strong likelihood of serious harm. *Brooks*, 800 F.3d at 1301. Without it,

Washington has failed to produce sufficient evidence that he was "incarcerated under conditions posing a substantial risk of serious harm" to support the first element of his Eighth Amendment claim. *Mosley*, 2020 WL 4249433, at *3. His inability to establish the first element could end our analysis. However, out of an abundance of caution and in order to give the parties the most thorough decision possible, the Court will, for argument's sake, assume that even if the facts of this case could demonstrate a substantial risk of serious harm, there is nothing in the record to show that Defendants were aware of—or were deliberately indifferent to—that risk.

b.    *Deliberate Indifference to a Substantial Risk of Serious Harm*

The second element—whether Defendants were deliberately indifferent to the substantial risk of serious harm—"has both a subjective and objective component." *Marbury*, 936 F.3d at 1233; *Mosely*, 2020 WL 4249422, at *4. That is, Washington must show both that Defendants actually (subjectively) knew that he faced a substantial risk of serious harm and that they disregarded that known risk by failing to respond to it in an (objectively) reasonable manner. *Mosely*, 2020 WL 4249433, at *4 (citation omitted). Even if Washington can establish that Defendants actually knew of a substantial risk to his safety, Defendants "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Washington attempts to show that Defendants subjectively knew of the substantial risk of serious harm he faced by directing the Court's attention to *Rodriguez*

16

*v. Secretary for Department of Corrections*. 508 F.3d 611, 618–20 (11th Cir. 2007). In that

case, the Eleventh Circuit Court of Appeals reversed a grant of summary judgment in

favor of a prison official because the prisoner informed prison officials that he feared for

his safety, requested to be moved, and was stabbed by one of the fellow prisoners he

feared after his request was denied. *Id.* Specifically, the appellate court reasoned that

where a prisoner verbally informs a prison official on at least two occasions that his life

had been threatened and submits a written request further detailing a fear for safety,

there is evidence of subjective knowledge to get his claim to a jury. *Id.* at 618.

Rodriguez is distinguishable for two reasons. First, according to Washington's

deposition testimony, no one had ever threatened his life before he and Inmates Dugger

and Gladdney got into the fight. It wasn't until after Washington gave Inmate Dugger

the television remote, and the two started to exchange words, that Inmate Dugger said,

"I'm going to kill you," to Washington. [Doc. 14-3, Washington Depo., pp. 17:1—18:22].

Second, unlike the prisoner in *Rodriguez*, Washington admits that—albeit because

"[t]hey wouldn't let [him]"—he "never filed a request for protective custody at BSP" or

a "request with the Classification Committee for a housing reassignment . . . while he

was house[d] in the same building as Inmates Dugger and Gladdney." [*Id.* at p. 64:5–

17]; [Doc. 19-1 at ¶¶ 59–60]. He only "ask[ed] multiple different people" to move him to

a different building and without an unattenuated life threat and a written request

17

submitted to the appropriate prison official, *Rodriguez* does little, factually, to help his case.[16] [Doc. 19-1 at ¶ 60].

In *Marbury*, however, a prisoner "repeatedly asked to be transferred because he was concerned about a general lack of safety in his cell block." 936 F.3d at 1233–34. In the letters to his warden and the verbal requests he made to a correctional officer at his prison, "he told them that he had witnessed fifteen inmate-on-inmate stabbings that he attributed to gang affiliations" and "express[ed] a fear for his own safety." *Id.* at 1231, 1234. Nevertheless, the Eleventh Circuit Court of Appeals held that "this evidence was insufficient to establish deliberate indifference to a substantial risk of serious harm." *Id.* at 1234. In so holding, the Court explained that "a plaintiff must show 'more than a generalized awareness of risk' to make out a deliberate indifference claim." *Id.*

In this case, Washington verbally "request[ed]" "to move out of the dorm" for over a month "to more than five people." [*Id.* at p. 33:6–7; 47:13–14; 89:7–8; 108:25—109:2]. Of these "more than five people," only two of them are named as defendants in this case: Defendant Farley and Defendant Warren. [Doc. 14-3, Washington Depo., p. 109:1]. The other prison officials to whom Washington requested to move are: Captain Bland, Lieutenant Easley, and Lieutenant Prosser, his mental health counselor, and the mental health director, but "they would not move [him]." [*Id.* at 25:4–11; 61:15–21; 62:1].

---

[16] Washington's requests were only verbal, and there is no evidence that he submitted a written request to prison officials who had the authority to remove him from Building H. [Doc. 14-2 at ¶ 11]; [Doc. 19-1 at ¶¶ 59–60]; *see also* n.7, *supra*.

Let's break down Washington's requests. At his deposition, Washington said that he was requesting to move because he "didn't want to fight anybody." [*Id.* at p. 108:23–25]. He told these BSP officials "that [he was] having problems in the dorm" and that he "need[ed] to move." [*Id.* at p. 61:15–21; 81:22 ("I'm having problems in the dorm, please move me."); 114:21–22 ("I'm having problems in the dorm, can you please move me.")]. As for Defendant Farley, Washington says that he "had been trying to move for over a month because [Inmates Dugger and Gladdney] kept jugging and throwing threats out." [*Id.* at pp. 24:25—25:2]. As for Defendant Warren, Washington says that he asked her "the same day [he] . . . approached Lieutenant Easley who was the shift supervisor[,]" but she told him, "No, I can't move you." [*Id.* at p. 114:12–18]. All he told Defendant Warren, however, was that he was "having problems in the dorm" and that he "couldn't name any names because it would cause further problems." [*Id.* at pp. 114:21–22; 115:1–2]. By Washington's account, he didn't need to "name any names" because Defendant Warren and Defendant Farley "already kn[e]w" who he was talking about since "other folks was [*sic*] having issues with [Inmates Dugger and Gladdney]." [*Id.* at pp. 114:23—115:5]. And lastly, as for Defendant Taylor, Washington testified that "[h]e had to" know about the problems because "he's over the whole compound." [*Id.* at 115:6–9].

Washington contends that Inmates Dugger and Gladdney's "violent disposition" coupled with "over a month's worth of small incidents leading up to" "[t]he fight" are

enough to show a substantial risk to his safety and that Defendants knew of that risk. [Doc. 19 at p. 8]. In short, Washington argues that Defendants knew that Inmates Dugger and Gladdney were "bullies" and that they knew about Inmate Dugger's violent nature. [*Id.* at p. 120:1–9].

Defendants, on the other hand, deny that they knew any of this. By Defendants' account, Washington never expressed any fears to them or asked any of them to transfer him from Building H, or H-3, specifically. First, Defendant Farley states that "[p]rior to December 22, 2017, [he] was not aware that Inmate Washington had any security concerns" and that "[he] was never aware that Inmate Washington had any problems with," was "afraid of," or "that he needed protection, or to be separated, from" Inmates Dugger and Gladdney. [Doc. 14-4, Farley Decl., ¶¶ 12–13]. Moreover, according to Defendant Farley, Washington "never asked" him for a transfer to another

building at BSP "for protective custody."[17] [*Id.* at ¶ 8]. Second, Defendant Milner[18] stated that Washington "never indicated to [her] that he was in danger, that he wanted to move out of H-3, or that he was afraid of Inmates Dugger and Gladdney." [Doc. 14-5, Milner Decl., ¶ 28]. And third, Defendant Taylor stated that "[i]n December of 2017, and the months prior," "[he] was not aware that . . . Washington was living in fear of" Inmates Dugger or Gladdney" and that "during [his] daily rounds of Building H" "Washington never informed [him] that he was living in fear of Inmates Dugger and Gladdney" [Doc. 14-7, Taylor Decl., ¶¶ 6, 8–9]. Not only did Defendant Taylor state that he was unaware of any fear, he also stated that "[he] was not aware that . . . Washington

---

[17] In his deposition testimony, however, Washington states "[Defendant] Farley said he couldn't move me." [Doc. 14-3, Washington Depo., p. 25:6].

[18] Washington also claimed that because Defendant Milner failed to intervene, she is liable under the Eighth Amendment. [Doc. 1 at ¶¶ 16–17]. For the reasons now discussed, Defendant Milner is entitled to summary judgment on this claim. "Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)). The burden is on Washington to show that Defendant Milner was in a position to intervene but failed to do so. *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008). Even if a constitution violation was at play in this case, the evidence clearly shows that Defendant Milner's actions were reasonable. She followed her training to diffuse the altercation between Washington and Inmates Dugger and Gladdney and to ensure the safety of herself and the other inmates at BSP. Moreover, this district has previously held, "[r]egardless of the presence or absence of a weapon in the hands of the attacking inmates, 'no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence.'" *Seals v. Marcus*, No. 1:11–CV–99 (WLS), 2013 WL 656873, at *8 (M.D. Ga. Jan. 25, 2013) (quoting *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006)).

wanted to move from Building H" and that "[he] was not aware that there were any problems between . . . Washington and Inmates Dugger and Gladdney.[19] [*Id.* at ¶ 11].

With Washington's version of the facts and Defendants' version, we clearly have "competing narratives [that] emerge on key events." *Sconiers*, 946 F.3d at 1263. The Court, therefore, is "not at liberty to pick which side [it] think[s] is more credible. *Id.* No, what the Court must do is "accept as fact all allegations" that Washington made, as "the [nonmoving] party," to the extent "they are sufficiently supported by evidence of record." *Id.* (citing *Anderson*, 477 U.S. at 251). Knowing what we know: who Washington told and what he told them, the Court is faced with a strikingly similar issue recently confronted by the Eleventh Circuit Court of Appeals, and it must decide whether a reasonable jury could find Washington's statement that he was "having problems in the dorms," "without any further details," sufficient to make Defendants aware of a substantial risk of serious harm. [Doc. 14-3, Washington Depo., pp. 61:16–17; 81:22; 114:21–22]; *Marbury*, 936 F.3d at 1236. Under current Eleventh Circuit precedent, the Court concludes that Washington's deliberate-indifference claim cannot proceed.

---

[19] Defendant Warren "was the Unit Manager for Building H," in 2017. [Doc. 14-8, Warren Decl, ¶ 3]. However, given that she "was also a compliance specialist and worked to ensure that BSP passed its audits by the American Corrections Association," she "was rarely at BSP or Building H." [*Id.* at ¶ 4]. Primarily focused on her work with the American Corrections Association, Defendant Warren stated that in December 2017, "the shift supervisor and the sergeant assigned to Building H" managed it. [*Id.* at ¶ 5]. Notwithstanding her rare physical presence at BSP or Building H, Warren stated that "Washington never asked [her] for protective custody at any time in 2017," "never disclosed to [her] that he needed protective custody, or a transfer, because he felt threatened by Inmate Dugger or Inmate Gladdney," and that "[she] had no reason to believe that Inmate Washington faced any risk of harm from Inmates Dugger or Gladdney at any time prior to December 22, 2017." [*Id.* at ¶¶ 6, 12, 14].

This precedent establishes that "officials must possess enough details about a threat to enable them to conclude that [the threat] presents a strong likelihood of injury, not a mere possibility." *Marbury*, 936 F.3d at 1236 (citations omitted). "The unfortunate reality is that 'threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* (citation omitted). Successful deliberate-indifference claims will generally require some further reason—beyond a prisoner informing prison officials of the threat—that could permit prison officials to conclude that a particular threat evidenced a substantial threat, as opposed to the mere possibility, of serious harm. *Id.* In other words, the prisoner must communicate more than the generic "problems" of prison life to alert the prison official that something needs to change. And in the Eleventh Circuit, "more than a mere awareness of an inmate's generally problematic nature" is required to substantiate a claim for deliberate indifference. *Johnson v. Boyd*, 701 F. App'x 841, 845 (11th Cir. 2017) (citation omitted); *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (holding that there must be much more than mere awareness of an inmate's generally problematic nature).

As for the required "further reason," Washington simply doesn't supply one, and "unless the [prison] official knows of and disregards an excessive risk to inmate health of safety[,]" that prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement." *Mosely*, 2020

WL 4249433, at *4 (citation omitted). Eighth Amendment caselaw requires that "the [prison] official must both be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and [that prison official] must also draw the inference." *Id.* (citing *Farmer*, 511 U.S. at 837).

Indeed, the Eleventh Circuit Court of Appeals held in *Rodriguez, supra*, that where a "prisoner informed prison staff that members of his former gang had threatened to kill him upon release into the general prison population," this information "was enough to place" the prison officials "on notice of a substantial risk of harm." *Id.* at 1236–37 (citing *Rodriguez*, 508 F.3d at 612–15). However, the *Rodriguez* court "observed that a vague statement like 'I have a problem with another inmate in this compound,' absent some information 'about the nature of the anticipated risk,' would not have created a genuine issue of fact regarding deliberate indifference to a substantial risk of serious harm." *Id.* at 1237 (quoting *Rodriguez*, 508 F.3d at 621–22).

This is precisely what Washington told to at least five prison officials at BSP— that he was "having problems." *See, e.g.*, [Doc. 14-3, Washington Depo., pp. 61:16–17; 81:22; 114:21–22]. Even though Washington didn't (nor does the law require him to) "identify the person who was threatening him by name" to BSP officials, it does require him to provide "other facts" to put Defendants (and the other prison officials) "on notice that he faced a substantial risk of serious harm." *Marbury*, 936 F.3d at 1237; [Doc. 14-3, Washington Depo., p. 115:1–5]. Washington's failure to present evidence that he

conveyed "other facts" to "put [BSP officials] on notice" of a substantial risk, renders his statement exactly like the one clearly rejected by the *Rodriguez* court.

Sure, the Court accepts as fact (because it is "sufficiently supported by" Washington's deposition) that Washington told BSP officials that he was "having problems in the dorm." *Sconiers*, 946 F.3d at 1263 (citing *Anderson*, 477 U.S. at 251)); [Doc. 14-3, Washington Depo., pp. 61:16–17; 81:22; 114:21–22]. The Court, to give Washington the benefit of all doubt, will even go one step further and make a small justiciable inference that Defendants knew that his complaints were about Inmates Dugger and Gladdney. *See* [*id.* at pp. 114:3—115:2 (Washington providing generalized responses to unobjected-to compound questions from his attorney on direct examination during his deposition regarding what he told Defendants Farley and Warren)]; *Anderson*, 477 U.S. at 255. However, even making this leap in Washington's favor, it does not affect Defendants' entitlement to summary judgment because he has failed to present evidence to "support a reasonable jury's finding that [Defendants] harbored a subjective awareness that [he] was in serious danger." *Marbury*, 936 F.3d at 1238.

Washington himself said that he "didn't . . . fathom" something like this happening to him. [Doc. 14-3, Washington Depo., pp. 118:25—119:1]. And if Washington didn't, how could Defendants—especially given his vague informational statement? At most, Washington has sufficiently shown "*some* risk of harm," but that is

insufficient for a deliberate-indifference claim. *Marbury*, 936 F.3d at 1238 (citations omitted). The evidence in this case, "would allow a jury to conclude that [Defendants and the other BSP officials were] put on notice that [Washington] faced some unspecified risk of harm to his well-being—not that [they were] aware he faced the type of substantial risk of serious harm necessary to establish deliberate indifference." *Id.*

As the Eleventh Circuit Court of Appeals stated in *Marbury*, "[t]o allow" a deliberate-indifference claim like Washington's "to proceed absent sufficient evidence that . . . [D]efendants were subjectively aware that he faced a substantial risk of serious harm would elide the 'subtle distinction' between deliberate indifference and mere negligence." 936 F.3d at 1238. Based on the facts of this case, there simply isn't enough to show that Defendants had subjective knowledge that Washington faced a substantial risk of serious harm. Accordingly, Washington cannot show that Defendants violated a constitutional right, and they are entitled to qualified immunity.

2.     Supervisory Liability for Defendant Taylor

As for Washington's separate claim for supervisory liability[20] against Defendant Taylor, § 1983 requires proof of a causal link between a defendant's acts and the alleged constitutional deprivation. *Averhart v. Warden*, 590 F. App'x 873, 874 (11th Cir. 2014) (citing *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993)). As explained above, Washington failed to present evidence that he suffered a constitutional deprivation in this case; thus, Defendant Taylor is entitled to summary judgment on this claim.

---

[20] Section 1983 claims may not be brought against supervisory officials solely on the basis of vicarious liability or respondeat superior. *Averhart*, 590 F. App'x at 874 (citing *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010)). To state a supervisory claim, a plaintiff must show the existence of a causal connection between the actions of the supervisor and the alleged constitutional deprivation by establishing: (1) a history of widespread abuse which put the supervisor on notice of the need to correct the alleged deprivation which he failed to correct, or (2) that the supervisor had a custom or policy that resulted in deliberate indifference to constitutional rights, or (3) facts which support an inference that the supervisor directed other defendants to act unlawfully or knew that other defendants would act unlawfully, and failed to stop them from doing so. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citations omitted). "Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary[,]" and "[t]he standard by which a supervisor may be held liable for the actions of subordinates is 'extremely rigorous.'" *Lazarus v. Hill*, No. 3:14–CV–21 (CAR), 2014 WL 4276208, at *1 (M.D. Ga. Aug. 29, 2014) (first quoting *King v. Henry*, No. 5:09cv365/MCR/EMT, 2011 WL 5877070, at *10 (N.D. Fla. Sept. 19, 2011) and then quoting *Cottone*, 326 F.3d at 1360).

## CONCLUSION

For the reasons discussed above, Washington cannot show that any Defendant violated the Eighth Amendment so the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 14].[21]

**SO ORDERED**, this 17th day of August, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[21] Washington also claimed that Defendants violated "the Constitution and laws of the State of Georgia." [Doc. 1 at ¶ 21]. Other than his bare-bones allegation that Defendants violated the Georgia Constitution, he never alleges any specific state-law violation. Nevertheless, "[t]he Georgia Constitution provides that state officers and employees 'may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.'" *Goodwin v. Crawford Cty.*, No. 5:18-cv-00030-TES, 2020 WL 873920, at *13 (M.D. Ga. Feb. 21, 2020) (quoting Ga. Const., art 1, § 2, ¶IX(d)). Thus, without demonstrating that Defendants acted with actual malice or with actual intent to cause injury while on the job, it is unlikely that Washington would pierce Defendants' entitlement to official immunity. In any event, Washington has abandoned his state-law claims because he never argued them in his Response [Doc. 19] to Defendants' Motion for Summary Judgment. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned, and affirming grant of summary judgment, as to claim presented in complaint but not raised in initial response to motion for summary judgment).